# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Laura A. G.,

       Plaintiff,

v.

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

       Defendant.

Case No: 22-cv-1228 (MJD/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Plaintiff Laura A.G.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 13) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant" or "the Commissioner") Motion for Summary Judgment (Dkt. 16). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying her application for supplemental security income. (*See generally* Dkt. 1.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, Plaintiff's Motion is granted in part and Defendant's Motion is denied.

## I.    <u>BACKGROUND</u>

On March 31, 2020, Plaintiff filed an application for Supplemental Security Income, alleging disability as of July 1, 2010.  (R. 24, 207, 230, 338.)[1]  Her application was denied initially and on reconsideration.  (R. 226, 250, 256, 263.)  Plaintiff requested a hearing, and on May 25, 2021, Plaintiff appeared for a telephonic hearing before Administrative Law Judge Sarah R. Smisek ("the ALJ").  (R. 24, 299, 320, 327, 431.) The ALJ issued an unfavorable decision on June 9, 2021, finding Plaintiff was not disabled.  (R. 21-41.)

Following the five-step sequential evaluation process under 20 C.F.R. § 416.920(a), the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since March 31, 2020, the application date.  (R. 26.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: diabetes, chronic pain syndrome, post-traumatic stress disorder ("PTSD"), major depressive disorder, and an anxiety disorder.  (R. 26.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 28.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC") to:

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 11.  It is also stated (incorrectly) in the record that Plaintiff filed her application on June 24, 2020. (*See* R. 343.)

> [P]erform sedentary work as defined in 20 CFR 416.967(a) except occasional climbing of ramps or stairs; never climbing ladders, ropes or scaffolds; occasional stooping, kneeling, crouching, and crawling; frequent handling and fingering of the right upper extremity; avoid concentrated exposure to hazards; no overhead reaching. The claimant requires work that is limited to simple, routine tasks performed in a work environment free of fast-paced production requirements and involving only simple, work-related decisions and routine workplace changes. The claimant can tolerate no more than incidental contact with the public and only occasional contact with co-workers and supervisors; requires a cane to ambulate to the workstation.

(R. 31.)  The ALJ found at step four that Plaintiff had no past relevant work.  (R. 40.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including: "final assembly, [Dictionary of Occupational Titles ("DOT")] #713.687-018, 60,000 jobs nationally; inspector, DOT#726.684-110, 70,000 jobs nationally, and laminator, DOT#690.685-258, 50,000 jobs nationally."  (R. 40.)  The ALJ represented that the VE's testimony was consistent with the DOT and found the VE's testimony persuasive in light of his professional experience.  (R. 40.)  Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 41.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-5, 336.)  Plaintiff then commenced this action for judicial review.  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of

record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.  In this case, because Plaintiff's challenge is limited to an issue relating to her mental health, the Court recounts only the record and testimony relevant to that impairment.

## II.    RELEVANT RECORD

### A.    Medical Record

Plaintiff attended therapy sessions at the Village Family Service Center ("VFSC") from September 2014 to April 2021.  (R. 617-85, 898-905, 1062-1105.)  Therapy notes indicate Plaintiff "reported avoiding people" and "[m]inimal progress being made."  (R. 663, 668, 672, 676.)  On July 10, 2018, Plaintiff was diagnosed with bipolar affective disorder.  (R. 84.)  Individual Treatment Plans completed by the VFSC in 2019 and 2020 list Plaintiff's diagnoses as: PTSD; major depressive disorder, recurrent episode and moderate; and generalized anxiety disorder.  (R. 662-63, 666-67, 670-71, 674-75.)

Plaintiff visited Adult Rehabilitative Mental Health Services ("ARMHS") practitioners from July 2019 to August 2021 and visited mental health practitioners at the Central Minnesota Mental Health Center ("CMMHC") from August 2019 to January 2021.  (R. 56-81, 112-36, 512-34, 536-46, 548-59, 592-99, 605-15, 820-29, 911-13, 948-65, 1052-54, 1173-1204.)  On July 15, 2019, it was noted that Plaintiff "does not trust people."  (R. 534.)  On July 16, 2019, Plaintiff stated that she had undergone a medication change and was "short fused with everyone and had many conflicts with others."  (R. 661.)  During Plaintiff's visits with the CMMHC, it was reported that she had good eye contact, linear and coherent thoughts without flights of ideas or tangents,

regular rate of speech and volume although it was delayed at times, stable mood, congruent affect, no evidence of hallucinations or psychosis, fair judgment and insight, average intellect, intact cognition and memory, good focus, and she was well groomed. (R. 605, 608, 611, 614, 912, 1054.)  On August 26, 2019, it was reported that Plaintiff's "anxiety is so high that she cannot work also due to this" and "[s]he has trouble interacting with other people."  (R.461.)

A Diagnostic Assessment conducted by the VFSC on September 3, 2019 lists a diagnosis of anxiety for Plaintiff.  (R. 679.)  Plaintiff's depression and anxiety symptoms were stated to cause "clinically significant distress or impairment in social, occupational, or other important areas of functioning and are not attributable to substance use or a medical condition."  (R. 679, 1063.)  Plaintiff's treatment included a "PCA through Custom Care" "for years," an ARMHS worker since March 2018, a mental health case manager since 2017, and a VFSC worker since 2014.  (R. 680.)  She had previously participated in "Day Treatment at Central MN Mental Health Center," although she was "unsure of dates."  (R. 680.)

On October 22, 2019, it was noted that Plaintiff's "anxiety is mostly social anxiety and/or stress related."  (R. 483.)  On October 25, 2019, it was reported that Plaintiff was considering moving in with her mother as it "would be good for her to live with another adult and have someone to spend time with."  (R. 523.)  " [She] openly discussed a newly reconciled friendship that appear[ed] to bring a lot of joy to her life at this time; she could not help but smile when speaking about this man."  (R. 523.)  Based on the November 15 and December 6, 2019 ARMHS practitioner's notes, Plaintiff was to attend a holiday

party, "appeared a bit nervous and said 'don't be surprised if I sit close to you, I like to stick with people I really know and like, groups make me nervous.'" (R. 519, 521.)

Plaintiff was noted to be in a good mood on December 20, 2019, however, she reported feeling "crabby with most people but attributed this to stress and anxiousness for Christmas . . . talked about her mental health symptoms and acknowledged how these have changed and manifested into her adult life." (R. 517.) "She identified coping strategies and safe relationships with others". (R. 517.) On January 10, 2020, Plaintiff stated that she was going shopping with her mother. (R. 514.) On January 31, 2020, Plaintiff shared that she was anxious about "having to be 'in a big group of people, it's too much." (R. 543.) On February 21, 2020, Plaintiff was "excited that a friend she had not seen for years was coming to town and they had plans to visit and catch up." (R. 540.) On March 20, 2020, Plaintiff was noted to be in "good spirits" and "mentioned that she ha[d] been spending more time doing meaningful things with her daughter, that she had gotten out of the house and was able to go for a bike ride." (R. 557.) On March 31, 2020, Plaintiff "was in a good mood and was getting ready to go out and about with her best friend for a drive." (R. 553.)

On April 3, 2020, Plaintiff was reported to be "doing really well right now" and "discussed plans to go get groceries with a friend the following day, something she really looks forward to doing and something that will get her out of the house for a while." (R. 552.) On May 13, 2020, Plaintiff noted that she had been socializing more with family and she was "feeling better overall." (R. 626.) On May 22, 2020, Plaintiff felt "very

overwhelmed as service providers ha[d] changed for her, leaving her to new people whom she [wa]s not familiar with and who d[id] not know her routine."  (R. 595.)

On June 12, 2020, Plaintiff shared her frustration about "how often people were calling and messaging her."  (R. 592.)  On July 7, 2020, Plaintiff "shared about frustrations she was experiencing due to interactions with others, parenting moments and barriers to using her coping."  (R. 617.)  On July 29, 2020, Plaintiff "described interactions with other [sic] that triggered her anger and then she explained she ha[d] been trying to avoid people."  (R. 902.)  On August 7, 2020, Plaintiff shared that she had visited two zoos with her daughter and her daughter's friend and that they "all had a great time."  (R. 954.)  On September 2, 2020, it was noted that Plaintiff's daughter's boyfriend had moved in "with them and she helped him get a job."  (R. 911.)  On September 11, 2020, Plaintiff shared that "she was doing 'good' and had been engaged with others and feeling 'pretty good' as she has her own room and space now."  (R. 950.)  On September 15, 2020, it was reported that Plaintiff had a good relationship with her daughter, parents, and friends.  (R. 1062.)

Plaintiff had guests staying in her home at various times, which heightened her stress level.  (R. 1177-78, 1184, 1186, 1189, 1203.)  On December 1, 2020, Plaintiff "reported one of the people she is allowing to live with her right now has been triggering [her] high levels of anxiety."  (R. 1083.)  Plaintiff continued to express heightened anxiety and stress due to letting people stay at her home temporarily.  (R. 1083-86, 1174.)  On December 18, 2020, Plaintiff stated that she had "been out shopping with her mother

and daughter for Christmas" and "had done well while shopping, but that there were way too many people especially given the pandemic our country is in." (R. 1187.)

On January 8, 2021, Plaintiff noted that she takes "Klonopin[2] primarily when she has to get on the city bus to ride with her daughter to work, and she finds it beneficial at these times." (R. 1052.) On March 5, 2021, Plaintiff reported that she had "gotten to 'get away' for most of the week to go stay with and visit a family friend who makes her feel very comfortable and happy." (R. 79.) On March 19, 2021, Plaintiff needed "to process, vent, and sort through how she was feeling to avoid 'blowing up at everyone." (R. 75.) On April 9, 2021, Plaintiff stated that she was going shopping with her mother. (R. 66.) On April 16, 2021, Plaintiff reported feeling "excited" about spending time with her best friend over the weekend. (R. 63.) On April 30, 2021, it was reported that Plaintiff was feeling depressed and sad, and that she was "struggling but noted that she goes through small bouts of depression that normally only last a few days." (R. 60.) On May 5, 2021, Plaintiff "appeared to be feeling much better today, reported no depression . . . requested a face-to-face outdoor appointment as it was beautiful outside" and "shared that her family had experienced a few losses and emergencies lately, but she was looking forward to a weekend away to relax after all of the 'trauma and drama.'" (R. 59.)

On May 14, 2021, Plaintiff was in a "very good mood and was eager to discuss resuming face-to-face appointments" every other week and while she had noted troubles

---

[2]    KlonoPIN is "used to treat panic disorder." *Clonazepam (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited June 19, 2023).

with her Independent Living Skills' ("ILS") worker, she "shared how things had been progressing with her PCA and her ILS worker" and was "advocating for what her needs and expectations are." (R. 56.) On July 1, 2021, Plaintiff stated that she had been "'very busy' driving people around" and noted that she had been experiencing a lot of pain leading to "severe changes in her mood." (R. 123.) On July 9, 2021, Plaintiff noted that she was going on a road trip by herself for the night, which was the first time she would be going "anywhere by herself, let alone in a vehicle she was driving." (R. 122.) On July 16, 2021, Plaintiff stated that she had gone on a trip for a class reunion and was "eager" to share her experience with the ARMHS practitioner, who noted it "appeared to be a big stress reliever for" Plaintiff. (R. 119.) On July 16, 2021, Plaintiff "noted substantial changes in her mental health" and "shared improvement in her symptoms and overall wellbeing." (R. 120.)

Plaintiff was "overwhelmed and frustrated" on August 4, 2021. (R. 114.) On August 17, 2021, it was noted that Plaintiff was "on disability due to her mental health- has a fairly flat affect- she can be easily overwhelmed- I believe she had an ARM[H]S worker to assist her." (R. 84.)

## B.  State Agency Psychologists' Opinions

On August 27, 2020, Nicole Robicheau, Psy. D., opined at the initial stage that Plaintiff was moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them. (R. 224.) Dr. Robicheau also opined that Plaintiff had social interaction limitations and that she was not significantly limited in her ability to: ask simple questions or request assistance; accept instructions

and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 224.) According to Dr. Robicheau, Plaintiff was moderately limited in her ability to interact appropriately with the general public, and she had the capacity to "interact with the general public, co-workers and supervisors on an incidental basis." (R. 224-25.) On October 13, 2020, Russell J. Ludeke, Ph.D., L.P., made the same findings at the reconsideration stage (R. 248.)

## C.    Testimony at the Hearing Before the ALJ

At the hearing, Plaintiff testified that the "anxiety of being around people" had made it difficult for her to work in the past year. (R. 144, 150.) She also testified that her depression, "especially over this last year, has been getting really bad" and she experienced anxiety attacks several times per week. (R. 150.)

## III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). Assessing and resolving credibility is a matter properly within the purview of the ALJ. *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

"Under 20 C.F.R. § 416.920c, 'prior administrative findings' . . . are evaluated for their 'persuasiveness' according to five factors: supportability, consistency, relationship with the claimant, specialization, and any other relevant factors." *Gloria C. v. Kijakazi*, Case No. 21-CV-1858 (JFD), 2022 WL 3359388, at *6 (D. Minn. Aug. 15, 2022). "The two most important factors are supportability and consistency." *Id.* (citing 20 C.F.R. § 416.920c(b)(2)).

## IV.   DISCUSSION

Plaintiff's sole challenge to the ALJ's determination is that the ALJ failed to properly evaluate and account for the opinions provided by the state agency

psychologists[3] in assessing an RFC to her.  (Dkt. 14 at 6-10; *see also* Dkt. 18.)  The Court discusses this issue below.

**A.    The ALJ's Consideration of the State Agency Psychologists' Opinions**

Plaintiff contends that while the ALJ found the opinions of the state agency psychologists persuasive and did not indicate that any portion of their opinions should be omitted from the RFC, the RFC assessed to her fails to account "for all of the persuasive limitations opined by the state agency psychologists" or explain why their opinions were omitted, thereby requiring a remand.  (Dkt. 14 at 6-9.)  Plaintiff contends that the state agency psychologists at the initial and reconsideration stages provided "the same mental health opinions," stating she "can carry out simple instructions, and maintain attention and concentration for simple activities"; "was limited to an environment where she was limited to simple, routine tasks and could interact with others on an incidental basis"; and "could adapt to a routine and predictable work environment."  (*Id.* at 7.)  Specifically, Plaintiff claims that while the state agency psychologists also limited her to "incidental interactions with the general public, co-workers, and supervisors," the RFC only limits her to "incidental interaction with the public" and "occasional contact with co-workers and supervisors."  (*Id.* at 8.)  Plaintiff argues that this limitation conflicts with the state agency psychologists' opinions.  (*Id.* at 8-9.)  Plaintiff asks the Court to reverse the decision of the Commissioner "and order immediate payment of Social Security disability benefits, with an onset of disability as alleged by Plaintiff[,]" or in the

---

[3]    The SSA refers to a reviewing psychologist as a "Psychological Consultant."  SSR 17-2p, 2017 WL 3928306, at *3.

alternative, remand this case to the Commissioner pursuant to the fourth sentence of 42

U.S.C. § 405(g) for further proceedings.  (*Id.* at 10.)

The Commissioner responds that the ALJ properly evaluated the opinions of the

state agency psychologists and correctly translated their opinions into vocational

findings.  (Dkt. 17 at 4-8.)  According to the Commissioner, no conflict exists between

the psychologists' opinions that Plaintiff be limited to "interact with the general public,

co-workers and supervisors on an incidental basis" and the RFC limiting her to "simple

work with incidental public contact and occasional contact with coworkers and

supervisors."  (*Id.*)  The Commissioner contends that "finding the agency psychologists'

opinions persuasive did not require [the] ALJ to parrot them" and that all of the jobs

assessed to Plaintiff have "the lowest possible communication demands recognized by

the" DOT.  (*Id.* (citing *DOT*, 713.687-018, 1991 WL 679271 (final assembly); 726.684-

110, 1991 WL 679616 (inspector or touch-up screener); 690.685-258, 1991 WL 678561

(laminator).)

A claimant's RFC is the "most [she] can do despite h[er] limitations, including

both physical and mental limitations."  *LeeAnthony C. v. Berryhill*, Case No. 18-cv-77

(NEB/TNL), 2019 WL 2343732, at *3 (D. Minn. May 13, 2019) (citing 20 C.F.R. §

416.945).  An ALJ's determination of "a claimant's RFC must be 'based on all of the

relevant evidence, including the medical records, observations of treating physicians and

others, and an individual's own description of [her] limitations."  *Id.* (quoting *Myers v.

Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)).  "The RFC is a function-by-function

assessment based upon all of the relevant evidence of an individual's ability to do work-

related activities." *Ackerman v. Kijakazi*, Case No. 4:21-CV-814 PLC, 2023 WL
2496839, at *4 (E.D. Mo. March 14, 2023) (quoting *Roberson v. Astrue*, 481 F.3d 1020,
1023 (8th Cir. 2007)) (cleaned up). "Because a claimant's RFC is a medical question, an
ALJ's assessment of it must be supported by some medical evidence of the claimant's
ability to function in the workplace." *Id.* (quoting *Combs v. Berryhill*, 878 F.3d 642, 646)
(8th Cir. 2017)). "An ALJ's RFC assessment which is not properly informed and
supported by some medical evidence in the record cannot stand." *Id.* (citations omitted).

The core of Plaintiff's contention is that "occasional" and "incidental" are not
interchangeable terms and that the ALJ erred by not limiting her to "incidental" contact
with co-workers and supervisors, as opined by the state agency psychologists. For
context, the Court provides the relevant portions of the RFC and Dr. Robicheau's and Dr.
Ludeke's opinions. The RFC provides: "The claimant can tolerate no more than
incidental contact with the public and only occasional contact with co-workers and
supervisors." (R. 31.) Dr. Robicheau and Dr. Ludeke opined that Plaintiff had capacity
to "interact with the general public, co-workers and supervisors on an incidental basis."
(R. 225, 248.)

In evaluating Dr. Robicheau's and Dr. Ludeke's opinions for purposes of
assessing an RFC to Plaintiff, the ALJ explicitly noted both doctor's opinions that
Plaintiff can "interact with the general public, co-workers and supervisors on an
incidental basis" and stated that the doctors' opinions were:

> [P]ersuasive though the undersigned phrased the limitations in more
> vocationally relevant terms. These consultants supported their opinions with
> explanation citing to the objective evidence to support their limits. These

opinions are consistent with the other evidence. This includes the mental status observations of Mr. Vickers (stable mood, fair insight and judgment, good focus and intact cognition and memory) discussed above, reported daily activities such as spending time with family and friends in therapy, reports she was doing "pretty good" with manageable anxiety in therapy observations of a good mood by her ARMHS worker.

(R. 39.)

It is not clear to this Court what the ALJ means by "more vocationally relevant terms."  The Commissioner argues the ALJ "correctly translated the conclusions of the State agency psychologists into vocational findings."  (Dkt. 17 at 4.)  But this is not persuasive because the ALJ chose to use the word "incidental" with respect to interaction with the public, suggesting that the ALJ viewed "incidental" as vocationally relevant.  To the extent the Commissioner argues that the ALJ believed "incidental" and "occasional" meant the same thing, this is inconsistent with the ALJ's use of both words in the same sentence to describe interactions with difference categories of people.  *Cf. Beef Nebraska, Inc. v. United States*, 807 F.2d 712, 717 (8th Cir. 1986) ("We must presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning.") (cleaned up); *Larson v. Nationwide Agribusiness Ins. Co.*, 739 F.3d 1143, 1147–48 (8th Cir. 2014) (finding difference between "'brought' an action" and "'filed' an action" when terms used in two successive sentences in contract) (collecting cases).

Moreover, numerous cases reflect a vocationally relevant difference between "incidental" and "occasional."  "Occasionally," as defined in the context of a sedentary RFC, means "occurring from very little up to one-third of the time . . ."  SSR 96-9p. 1996

WL 374185, at *3 (July 2, 1996).  As noted by the Commissioner, the SSA has not

defined "incidental."  However, several ALJs have described "incidental" in RFCs

assessed to claimants as follows: "more than never and less than occasional."  *See, e.g.*,

*Maria S. v. Comm'r of Soc. Sec.*, 5:21-CV-0544 (NAM), 2022 WL 3017373, at *3

(N.D.N.Y. July 29, 2022) (RFC defining "incidental" as "more than never and less than

occasional"); *Ezequiel C. v. Kijakazi*, 5:21-CV-00382 (MAD/DJS), 2022 WL 2231178, at

*1 (N.D.N.Y. May 12, 2022) (same); *Debra Lanette P. v. Comm'r of Soc. Sec.*, No. 5:20-

CV-1634 (CFH), 2022 WL 1063169, at *3 (N.D.N.Y. April 7, 2022) (RFC limiting the

plaintiff to "only occasional contact with co-workers and supervisors, and only incidental

contact with the public" and explaining: "Incidental is defined as more than never and

less than occasional.  In other words, [plaintiff] should not have direct interaction with

the public, but she need not be isolated away from the public.") *see also Daniel K. v.

Comm'r of Soc. Sec.*, 1:20-CV-0674 (WBC), 2021 WL 3172912, at *1 (W.D.N.Y. July

27, 2021) (RFC limiting the claimant to "occasional interaction with supervisors and rare

(defined as less than occasional but not never, sometimes referred to as incidental)

interaction with coworkers or the public.") (cleaned up).  Indeed, in one case, the RFC

specified:

> [O]ccasional contact with supervisors and incidental contact with coworkers
> and the general public. ("Incidental" contact with coworkers: may encounter
> or pass in common areas, such as time clocks, breakrooms, restrooms,
> lunchrooms; may even work at the same table with other workers; no
> requirement of interaction with coworkers in order to successfully complete
> assigned tasks. "Incidental" contact with the general public: may pass or
> encounter in common areas, such as hallways, restrooms or lobbies, but there
> would be no requirement of interaction with the general public in order to
> successfully complete assigned tasks.)

*Hague v. Comm'r of Soc. Sec.*, No. 20-13084, 2022 WL 1055457, at *3 (E.D. Mich. Feb. 1, 2022), *R. & R. adopted*, No. 20-13084, 2022 WL 965027 (E.D. Mich. Mar. 30, 2022).

In sum, while the Court agrees with the Commissioner that an ALJ need not "parrot" the agency psychologists' opinions (Dkt. 17 at 4, 6-8), the Court cannot conclude on this record that the words "occasional" and "incidental" have the same meaning, or that the ALJ intended them to have the same meaning.

The Commissioner also argues that "Plaintiff had the capacity to do several sedentary, unskilled jobs, all of which had the lowest possible communication demands recognized by the Dictionary [of Occupational Titles]," and that "type of contact for unskilled work is inherently incidental." (*Id.* at 5, 8.) This does not change the fact that the ALJ did not adopt the limitations set forth by the agency psychologists even though she found their opinions persuasive, or does it substitute for the lack of explanation by the ALJ why she adopted different limitations as to interactions with co-workers and supervisors than the agency psychologists. *See Susan H. v. Kijakazi*, No. 21-cv-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023) (sustaining plaintiff's objection that magistrate judge made "'post hoc rationalizations' to explain the ALJ's decision" and remanding because "[t] he ALJ's failure to 'explain how she considered the supportability and consistency factors for a medical source's medical opinions' is legal error") (cleaned up); *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *5-6 (E.D. Mich. Aug. 13, 2021) (sustaining plaintiff's objection to report and recommendation where "[b]oth the Commissioner [in the summary judgment brief] and

the magistrate judge described other evidence in the administrative record that could

furnish substantial evidence for a nondisability finding and support for rejecting the

physicians' opinions" because this approach "ignores the mandate of the regulations that

guarantees claimants a certain level of process that cannot be discounted by the

substantial evidence test alone").

The Commissioner also argues: "One court has accurately stated that 'Not

Significant' for the category "People: 8—Taking Instructions—Helping" does not require

*any* interaction at all with other workers or the public."  (Dkt. 17 at 8 (citing *Alie v.*

*Berryhill*, No. 4:16 CV 1353 JMB, 2017 WL 2572287, at *16 (E.D. Mo. June 14, 2017).)

What the *Alie* court actually said was "Level 8 interaction is compatible with a RFC

limiting a claimant to only superficial contact with coworkers, supervisors, and the

public" and:

> The DOT description of a laundry worker shows **any interaction required**
> **of a claimant with coworkers or the public would only be incidental to**
> **his primary task of tending to washing and drying machines, which**
> **would not require interaction with coworkers or the public**. The DOT
> description of a laundry worker's duties includes numerous other tasks that
> do not require interaction with others, including sorting, ironing, and folding
> laundry; adjusting machine settings; and measuring detergent, starches, and
> fabric softener. This position is characterized as involving the lowest level of
> interaction with people assigned in the DOT and rated as performing
> repetitive or short cycle work.

*Id*.  *Alie* did not broadly hold that "Not Significant" for the category "People: 8—Taking

Instructions—Helping" does not require any interaction at all with other workers or the

public.  And even if it did, the articulation requirement set forth 20 C.F.R. § 416.920c did

not apply in *Alie*.  *See Troy L. M. v. Kijakazi*, Case No. 21-cv-199 (TNL), 2022 WL

4540107, at *14-15 (D. Minn. Sept. 28, 2022) (remanding where the ALJ found the state agency psychologists' opinions persuasive but failed to include their limitation to superficial interaction with others in the RFC and instead included a limitation to occasional interaction with others without explaining why the psychologists' limitation was not included; noting that the jobs assessed to the plaintiff were unskilled jobs with a people rating of 8 but rejecting the Commissioner's argument that "there is no reasonable basis to believe that unskilled jobs . . . require a worker to have any more intimate interaction with coworkers or the public than the superficial contact" limitation provided by the psychologists; and stating "'an ALJ's reasoning need only be clear enough to allow for appropriate judicial review.' But here, the ALJ's analysis was incomplete. . .  It is simply not clear from the ALJ's decision why, if the prior administrative medical findings of the state agency psychological consultants were 'generally . . . persuasive,' a limitation to superficial interactions with others was not included in the residual functional capacity, or alternatively, if such a limitation was intended to be included, how a quantitative limitation sufficiently accounted for reduced functioning with respect to the type of interaction with others.") (cleaned up) (footnote omitted).

In sum, the Court cannot determine why the ALJ limited Plaintiff to "occasional contact with co-workers and supervisors" but "incidental contact with the public"; why the ALJ substituted "occasional" for "incidental"; and whether the ALJ intended for "occasional" and "incidental" to mean the same thing or something different (or recognized that they could be different).  As such, because the ALJ found Dr. Robicheau's and Dr. Ludeke's opinions persuasive, but did not include the aspect of their

opinions limiting Plaintiff to incidental contact with co-workers and supervisors and did not provide any explanation as to why "occasional" was substituted for "incidental," the Court recommends remand so the ALJ can clarify these issues, articulate her treatment of the state agency psychologists' opinions consistent with 20 C.F.R. § 416.920c and, if necessary, take additional VE testimony. *See Ashley E. A. v. Kijakazi*, No. 22-CV-280 (WMW/TNL), 2023 WL 2283455, at *9 (D. Minn. Jan. 30, 2023) ("In sum, it is simply not clear from the ALJ's decision why a limitation to superficial interactions with others was not included in the residual functional capacity, or, alternatively, if such a limitation was intended to be included, how a quantitative limitation sufficiently accounted for reduced functioning with respect to the type of interaction with others. . . . Thus, the ALJ's analysis was incomplete and contains unresolved conflicts of evidence, and remand is required for the ALJ to further address the state agency psychological consultants' opinions regarding superficial interactions. The ALJ should address specifically Drs. Karayusuf, Boyd, and Sullivan's opinions that Plaintiff was limited to brief, superficial, and infrequent interactions with others, why he declined to include this limitation in the residual functional capacity, or explain how the residual functional capacity accommodated this limitation."), *R. & R. adopted sub nom.*, No. 22-CV-280 (WMW/TNL), 2023 WL 2273153 (D. Minn. Feb. 28, 2023).

\* \* \*

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment be granted, and Defendant's Motion for Summary Judgment be denied.

## V.    <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that**:**

1.      Plaintiff's Motion for Summary Judgment (Dkt. 13) be **GRANTED in**

**part**;

2.      Defendant's Motion for Summary Judgment (Dkt. 16) be **DENIED**; and

3.      This case be **REMANDED** to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report

and Recommendation.

DATED: June 20, 2023                          <u>*s/Elizabeth Cowan Wright*</u>
                                              ELIZABETH COWAN WRIGHT
                                              United States Magistrate Judge

### <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).